1
2
3
4
5
6
7
8

9                    **UNITED STATES DISTRICT COURT**

10                   **SOUTHERN DISTRICT OF CALIFORNIA**

11  RYAN VIGIL, on behalf of himself          CASE NO. 15-cv-0079 JM (DBH)
    and all others similarly situated,
12                                            ORDER DISMISSING PLAINTIFF'S
                                   Plaintiff, FIRST AMENDED COMPLAINT
13       vs.                                  WITH LEAVE TO AMEND

14  GENERAL NUTRITION
    CORPORATION, a Pennsylvania
15  corporation,

16                                Defendant.

17  _____

18       This order addresses Defendant General Nutrition Corporation's ("GNC's")

19  motion to dismiss Plaintiff Ryan Vigil's first amended complaint ("FAC") pursuant

20  to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6).  (Doc. No. 25.)  The

21  motion was fully briefed and found suitable for resolution without oral argument

22  under Local Civil Rule 7.1.d.1.  For the reasons set forth below, the court grants

23  GNC's motion to dismiss all claims, but also grants Plaintiff's request for leave to

24  amend.

25  ///

26  ///

27  ///

28  ///

# BACKGROUND[1]

This case concerns the labeling and marketing for GNC's product Staminol, which, Plaintiff claims, is incapable of delivering the promised benefits. Plaintiff asserts causes of action for (1) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 et seq.; (2) violation of the California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750 et seq.; and (3) breach of express warranty.

Plaintiff alleges as follows: GNC markets and distributes Staminol as an over-the-counter supplement for men. (Id. ¶ 2.) The labeling and marketing for Staminol represent that it is designed to enhance male sexual performance, is scientifically formulated to provide maximum potency, and supports male vitality, sexual health, urinary flow, and prostate health. (Id.) The front panel of the Staminol package contains the following statements:

- Supports male vitality with proprietary blend including L-arginine and maca*

- Features horny goat weed and yohimbe, herbs traditionally used to support sexual health*

- Supports urinary flow and prostate health with saw palmetto*

- Formulated with premium ingredients to provide maximum potency*

(Doc. No. 25-3, Exh. 1.)

///

///

---

[1] The facts in this section are drawn from the allegations in the FAC, (Doc. No. 17), the partial copy of the Staminol package Plaintiff attached to the FAC, (Doc. No. 17, Exh. A), and the full copy of the package and the reports Plaintiff summarizes and cites in the FAC, which GNC attached to its motion, (Doc. No. 25-3, Exhs. 1–6). Under the doctrine of incorporation by reference, discussed below, the court may consider the full product label because Plaintiff quoted part of it, and may consider the articles because Plaintiff summarizes and relies upon them and does not dispute the authenticity of the copies GNC attached to its motion. For purposes of this motion, Plaintiff's allegations are taken as true to the extent that they are well pleaded.

The left side panel of the package reads:

**GNC Staminol™** is physician endorsed by Frank J. Costa, M.D., an internationally acclaimed urological surgeon, men's health expert and member of the GNC Medical Advisory Board.

***"Staminol™ is a powerful male performance formula backed by GNC quality.  This premium formula combines the best herbs with guaranteed potencies to support vitality and enhance performance. I highly recommend this product for men who are looking for a superior formula to address male performance concerns."***
***– Frank J. Costa, M.D.***

**Why Should I Use Staminol™?**
Staminol™ offers a premium formula containing a proprietary blend of key nutrients and exotic herbs to enhance male sexual performance.*

**How Can Staminol™ Benefit Me?**
Staminol™ is designed to support male vitality and sexual health.* It is scientifically formulated to provide maximum potency, as well as support healthy urinary flow and prostate health.*

**How Does Staminol™ Work?**
Staminol™ combines L-arginine, an important amino acid that supports nitric oxide production, with herbs traditionally used to support sexual health such as horny goat weed and yohimbe. Additionally, saw palmetto supports urinary health and normal prostate function.*

> \*   These statements have not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease.

(Id.)

Under the heading "Supplement Facts," the opposite side panel lists thirteen ingredients:

| | |
|---|---|
| Proprietary Blend | 200 mg* |
| L-Arginine | |
| Epimedium Extract | |
| Maca Root Powder (*Lepidium meyenii*) | |
| Kola Nut (*Kola nitida*) | 175 mg* |
| Oat Straw Stems (*Avena sativa*) | 150 mg* |
| GABA (gamma-Aminuobutyric Acid) | 100 mg* |
| Nettle Leaf (*Urtica dioica*) | 100 mg* |
| Yohimbe Bark Extract | 60 mg* |
| (*Pausinystalia yohimbe*) | |
| Horny Goat Weed (*Epimedium sagittatum*) | 20 mg* |
| Catuaba Bark (*Erythroxylum catuaba*) | 10 mg* |

| Muira Root (*Ptychopetalum olacoides*) | 10 mg* |
| Damiana Leaf (*Turnera aphrodisiaca*) | 10 mg* |
| Saw Palmetto Berry (*Serenoa repens*) | 10 mg* |

　　　　　　*Daily Value not established.

(Id.)  Gelatin and dicalcium phosphate are listed as "Other Ingredients."[2]  (Id.)

Plaintiff alleges that the Staminol labeling is false because various studies have shown that Staminol's primary ingredients—which he identifies as horny goat weed, maca root powder, L-arginine, catuaba bark, oat straw stems, damiana leaf, saw palmetto berry, and muira root—do not provide any of the promised health or sexual performance benefits, either when taken alone or in combination with other ingredients.  (FAC ¶¶ 16–17.)  Further, he asserts, the minimal amount of remaining ingredients also cannot produce the promised effects, either when taken alone or in combination with one another.  (Id. ¶ 17.)  As support, he summarizes three scientific articles and information from the NYU Langone Medical Center's website.

Plaintiff's first article, Mario Dell'Agli et al., *Potent Inhibition of Human Phosphodiesterase-5 by Icariin Derivatives*, 71(9) Nat'l J. Products 1513 (2008),[3] assessed icariin and various icariin derivatives in comparison with Viagra. Preliminarily, the authors tested various plant extracts traditionally used for male potency for their ability to inhibit phosphodiesterase-5A1 ("PDE5").  Id.  Medicines like sildenafil (Viagra) that are currently used for treating erectile dysfunction work by selectively inhibiting PDE5.  See id.  The authors found that only the extract of "Epimedii Herba," which "is the common name for the dried aerial parts of *E. brevicornum*, *E. sagittatum* Maxim., or *E. korneanum* Nakai, collected in the summer," was active against PDE5.  Id.  They state, "The observation that only *E. brevicornum* and its active principle [icariin] inhibited PDE5 in a significant

_____

[2]  Neither party addresses the representations on the back panel.

[3]  The article is attached to GNC's motion to dismiss, (Doc. No. 25-3, Exh. 5), and is available online at http://pubs.acs.org/doi/full/10.1021/np800049y.

- 4 -

manner, in agreement with previous results, suggests that other plant extracts may interfere with erectile function through mechanisms other than PDE5 inhibition." Id. (footnotes omitted).  The authors focused on assessing the PGE5 inhibitory potency of icariin, the active component in *E. brevicornum*, and derivatives of icariin.  Id. at 1513–15.  They found that icariin itself "was a good PDE5 inhibitor . . . but required improvement in order to have equivalent potency to sildenafil." Id. at 1513.  One derivative tested was "80 times more potent" than icariin, id., with PGE5 inhibitory potency "almost identical to that of sildenafil," id. at 1515.

Plaintiff alleges that icariin is the active compound in horny goat weed, and, because icariin is 80 times less potent than Viagra, "consuming Horny Goat Weed is not an effective means of enhancing a man's sexual experience by alleviating the symptoms of erectile dysfunction."  (FAC ¶ 18.)

Plaintiff's second article, Byung-Cheul Shin et al., *Maca* (L. Meyenii) *for Improving Sexual Function:  A Systematic Review*, 10 BMC Complementary & Alternative Med. 44 (2010),[4] evaluated clinical research on the effectiveness of maca on sexual performance.  A database search revealed 88 articles that discussed maca and sexual health, of which only four met the authors' inclusion criteria.  Id. at 2–3.  Of those, three tested the effects of maca on men.  Id. at 4.  The first trial studied the effects of maca versus placebo on men with erectile dysfunction, and "showed positive effects."  Id.  The second trial tested different dosages of maca on healthy men compared to placebo, and reported "positive effects" on sexual desire from both dosages.  Id.  The third trial, which studied male cyclists, "failed to show positive effects of maca in the improvement of sexual desire," although the authors noted that it "had a very small sample size."  Id.  The authors conclude:

> The results of our systematic review provide *limited evidence for the effectiveness of maca in the improvement of sexual function*.

---

[4]  The article is attached to GNC's motion to dismiss, (Doc. No. 25-3, Exh. 2), and is available at http://www.biomedcentral.com/1472-6882/10/44.  The page numbers cited here refer to the page numbers used in the PDF download.

1
2
> However, the total number of trials, the total sample size, and the average methodological quality of the primary studies were *too limited to draw firm conclusions*.

3    Id. at 5–6 (emphasis added).

4        Plaintiff's third article, R. Stanislov & V. Nikolova, *Treatment of Erectile*
5    *Dysfunction with Pycnogenol and L-arginine*, 29(3) J. of Sex & Marital Therapy
6    207 (2003),[5] "investigated the possibility of overcoming erectile dysfunction (ED)
7    by increasing the amounts of endogenous [nitric oxide]." Id. at 207. According
8    to the article, "[n]itric oxide (NO) is considered to be the principal mediator of
9    penile erection," acting as both a neurotransmitter and vasodilator. Id. at 208.
10   Oral supplementation with L-arginine is one method of achieving higher nitric
11   oxide levels, and, according to a 1999 study, "was shown to be helpful for a limited
12   number of men with ED. However, other studies have questioned the efficacy of
13   L-arginine treatment." Id. (citation omitted). The present study assessed whether
14   pycnogenol, an antioxidant that enhances nitric oxide production, was effective for
15   treating erectile dysfunction in combination with L-arginine. See id. In the first
16   month of the study, the 40 participants took daily doses of L-arginine aspartate. See
17   id. at 209. In the second month, they also took a certain amount of pycnogenol, and
18   in the third month, the amount of pycnogenol was increased. See id. The authors
19   report that two study participants experienced normal erections using L-arginine
20   alone in the first month, although "[t]he improvement . . . did not reach significance
21   over pretreatment." Id. at 210 (emphasis added). That result was consistent with
22   the 1999 study, in which the "limited number" of recovered participants was "no[t]
23   statistically significant." Id. at 212 (emphasis added). However, 92.5% of study
24   participants (37 out of 40) had recovered by the end of the trial when using both
25   L-arginine and pycnogenol. See id. at 212.

26       Last, Plaintiff refers to the NYU Langone Medical Center's website. Under

27

28       [5] This article is attached to GNC's motion to dismiss, (Doc. No. 25-3, Exh. 6), and is available online at http://www.ncbi.nlm.nih.gov/pubmed/12851125.

the heading "Impotence,"[6] the site states that oat straw, catuaba, damiana, muira, saw palmetto, and a number of other herbs "are also reputed to improve sexual function in men. . . .  *However, there is as yet no real evidence that they offer any benefits.*"  (Emphasis added.)  Under the heading "Saw Palmetto,"[7] the site reports that "Saw palmetto oil is an accepted medical treatment for benign prostatic hyperplasia (BPH) in New Zealand and in France, Germany, Austria, Italy, Spain, and other European countries. . . .  Most, thought [sic] not all, research suggests that saw palmetto can markedly improve" the typical urinary difficulties associated with BPH.  However, the site also notes, "*The scientific evidence for the effectiveness of saw palmetto in treating prostate enlargement is inconsistent.*"  (Emphasis added.)  It elaborates that while numerous studies had shown some improvement from saw palmetto, "[a] more recent well designed, placebo-controlled trial involving 369 men found that saw palmetto even at high doses (three times the standard dose) did not improve urinary flow rate compared to placebo."

Thus, Plaintiff claims, although GNC represents that Staminol can enhance users' potency and sexual performance and that it supports urinary flow and prostate health, reliable scientific research reveals that many of the product's primary ingredients do not provide these benefits.  (Id. ¶ 23.)  In sum, he asserts, Staminol is totally ineffective at providing the benefits GNC touts, and those representations, in turn, lead consumers to buy the product.  (Id.)

In April 2014, Plaintiff read the Staminol label at a GNC store, including the representations regarding the product's sexual-health and performance benefits.  (Id. ¶ 13.)  He relied on the labeling, desired to enhance his sexual experience and

---

[6]  A printout of this webpage is attached to GNC's motion, (Doc. No. 25-3, Exh. 3).  Both parties cite http://www.med.nyu.edu/content?ChunkIID=21720.  This link no longer connects to this content.

[7]  A printout of this webpage is attached to GNC's motion, (Doc. No. 25-3, Exh. 4).  Both parties cite http://www.med.nyu.edu/content?ChunkIID=21865.  This link no longer connects to this content.

1  enjoyment, believed Staminol would provide the advertised benefits, and bought

2  a bottle for $19.99.  (Id.)  He did not, however, receive any benefits from using it.

3  (Id. ¶ 37.)  Had he been aware that the representations were not true, he would not

4  have bought the product.  (Id. ¶ 13.)

5      Plaintiff alleges that this court has jurisdiction pursuant to the Class Action

6  Fairness Act, 28 U.S.C. § 1332(d)(2), as he is a California resident, GNC is a

7  Pennsylvania corporation headquartered in Pennsylvania, and the amount in

8  controversy exceeds $5,000,000.  (Id. ¶¶ 10, 13–14.)  He seeks to litigate on behalf

9  of consumers who purchased Staminol in California and states with similar laws

10  within the relevant limitations period, up until the time of class notice.  (Id. ¶ 27.)

11  He seeks actual, punitive, and statutory damages; restitution and disgorgement;

12  declaratory and injunctive relief; and costs and fees.  (Id. ¶¶ A–H.)

13      On February 3, 2015, GNC moved to dismiss the first amended complaint for

14  failure to state a claim under Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6).

15  (Doc. No. 25.)  Plaintiff opposed the motion on March 2, 2015, (Doc. No. 26), and

16  GNC replied on March 9, 2015, (Doc. No. 27).

17                                **LEGAL STANDARDS**

18      A complaint must contain "a short and plain statement of the claim showing

19  that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Complaints alleging

20  fraud must, additionally, satisfy the heightened pleading standards for fraud under

21  Rule 9(b), which requires the complaining party to "state with particularity the

22  circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

23      A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency

24  of the pleadings.  See Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  For a

25  plaintiff to overcome a Rule 12(b)(6) motion, the complaint must contain "enough

26  facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v.

27  Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

28  plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The court "must take all of the factual allegations in the complaint as true," but is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. (internal quotation marks omitted).  Factual pleadings merely consistent with a defendant's liability are insufficient to survive a motion to dismiss because they establish only that the allegations are possible rather than plausible. See id. at 678–79.  The court should grant 12(b)(6) relief if the complaint lacks either a cognizable legal theory or facts sufficient to support a cognizable legal theory. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

When addressing a Rule 12(b)(6) motion, courts generally may not consider materials outside the pleadings. See Schneider v. Cal. Dep't of Corrs., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); Jacobellis v. State Farm Fire & Cas. Co., 120 F.3d 171, 172 (9th Cir. 1997); Allarcom Pay Television Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995).  "The focus of any Rule 12(b)(6) dismissal . . . is the complaint." Schneider, 151 F.3d at 1197 n.1.  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

Of particular relevance here, under the doctrine of incorporation by reference, "a court may consider evidence on which the complaint necessarily relies if:  (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks omitted).  "The court may treat such a document as part of the complaint, and thus may assume that its contents are true for the purposes of a motion to dismiss under Rule 12(b)(6)." Id. (internal quotation

marks omitted).  The court may also "consider the full texts of documents which the complaint quotes only in part."  <u>Cooper v. Pickett</u>, 137 F.3d 626, 623 (9th Cir. 1997).  Courts are "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."  <u>Gonzalez v. Planned Parenthood of Los Angeles</u>, 759 F.3d 1112, 1115 (9th Cir. 2014) (brackets and internal quotation marks omitted).

Federal Rule of Civil Procedure 15 provides that leave to amend should be granted when justice requires it.  Accordingly, when a court dismisses a complaint for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  <u>DeSoto v. Yellow Freight Sys., Inc.</u>, 957 F.2d 655, 658 (9th Cir. 1992) (internal quotation marks omitted).  Amendment may be denied, however, if amendment would be futile.  <u>See</u> <u>id.</u>

<strong>DISCUSSION</strong>

Before analyzing the legal issues in this case, it is essential to understand its nature.  This is a putative class action based on Plaintiff's fundamental assertion that GNC's product, Staminol, is marketed through "false and misleading advertis[ing]."  (FAC ¶ 1.)  Further, Staminol is falsely represented to (1) increase male sexual performance and vitality (whatever that may mean); (2) treat prostate issues (again, unclear); and (3) treat urinary flow issues (less speculative).  All of these references are contained in the first paragraph, as well as allegations that Plaintiff is suing on behalf of all "Staminol purchasers who were duped into purchasing [Staminol]."  (<u>Id.</u>)

Importantly, however, Plaintiff alleges that he purchased Staminol only because he "desired to enhance his sexual experience and enjoyment" and for "sexual health and performance benefits."  (<u>Id.</u> ¶ 13.)  Setting aside how it is difficult to assess with exactitude how Staminol fell short of Plaintiff's desires, one thing seems clear:  Plaintiff is not claiming that he purchased Staminol to treat

prostate or urinary "issues."

So, at the threshold of this action we already have problems; Plaintiff is apparently trying to represent three potentially distinct classes even though he may not qualify as a member of two of them.  Given that Plaintiff's FAC is predicated only upon his claims as they relate to his purchase of Staminol to enhance sexual vitality and performance, and not for prostate or urinary issues, Defendants' motion to dismiss is granted as to all claims insofar as they relate to Staminol as a product to address prostate and urinary issues.

With this in mind, the court turns to the remainder of Plaintiff's claims, which GNC contends must all be dismissed without leave to amend.  The court addresses each of them below.

**1.   UCL Claim**

The UCL prohibits "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."  Cal. Bus. & Prof. Code § 17200.  Its coverage is "sweeping" and "intentionally broad," so as to allow courts "maximum discretion to prohibit new schemes to defraud."  In re First Alliance Mortg. Co., 471 F.3d 977, 995 (9th Cir. 2006).  "An act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent."  Berryman v. Merit Prop. Mgmt., Inc., 152 Cal. App. 4th 1544, 1554 (2007).  Each word represents "a separate and distinct theory of liability."  Rubio v. Capital One Bank, 613 F.3d 1195, 1203 (9th Cir. 2010) (internal quotation marks omitted).  Here, Plaintiff alleges that GNC has violated all three prongs.

**A.   "Fraudulent"**

False-advertising claims under the UCL are governed by the "reasonable consumer test."  Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008).  Under the reasonable-consumer standard, the plaintiff "must show that members of the public are likely to be deceived."  Id. (internal quotation marks omitted).  Defendants may be liable "not only for advertising which is false, but also

1  advertising which, although true, is either actually misleading or which has a

2  capacity, likelihood, or tendency to deceive or confuse the public." Id. (brackets

3  and internal quotation marks omitted).  Whether a business practice is deceptive

4  is usually a question of fact not appropriate for resolution on a motion to dismiss.

5  See id.  In such cases, "the plaintiff bears the burden of proving the defendant's

6  advertising claim is false or misleading."  Nat'l Council Against Health Fraud,

7  Inc. v. King Bio Pharm., Inc., 107 Cal. App. 4th 1336, 1342 (2003).

8      As to this claim, Plaintiff alleges that GNC's various actions, representations,

9  non-disclosures, and misleading statements regarding Staminol were likely to

10  deceive the consuming public.  (FAC ¶¶ 43–44.)  He identifies the following

11  statements from the Staminol label as the basis of his claim:

12      •   Supports male vitality with proprietary blend including
            L-arginine and maca
13
14      •   Formulated with premium ingredients to provide maximum
            potency
15
        •   [S]cientifically formulated to provide maximum potency,
            as well as support healthy urinary flow and prostate health
16
17      •   [S]upport[s] vitality and enhance[s] performance

18      •   Supports urinary flow and prostate health with saw palmetto

19  (Id. ¶ 37.)

20      GNC argues that this claim must dismissed for several reasons.  The court

21  addresses each of them below.

22              **i.    Lack of Substantiation**

23      Both parties agree that Plaintiff cannot base his claim on a lack of

24  substantiation because there is no private remedy for unsubstantiated advertising,

25  and a lack of substantiation is insufficient to establish that representations are false

26  or misleading.  (Doc. No. 25-1 at 14–15; Doc. No. 26 at 9.)

27      Plaintiff contends, however, that he has sufficiently alleged that

28  Staminol's health and sexual performance claims are provably false, not merely

15cv0079

unsubstantiated, and that GNC has mischaracterized his claims by cherry-picking the allegations.  (Id. at 9–10 & n.5.)

Claims based on a lack of substantiation, rather than provable falsehood, as noted, are not cognizable under the California consumer-protection laws.  See In re Clorox Consumer Litig., 894 F. Supp. 2d 1224, 1232 (N.D. Cal. 2012) (collecting cases).  This is, in part, because California Business & Professions Code § 17508, which establishes procedures for certain government authorities to require substantiation of advertising claims, "does not authorize consumers or other private entities to make substantiation demands."  Id.

"Courts look to a plaintiff's complaint as a whole when determining if a plaintiff merely alleged a lack of substantiation claim."  Bronson v. Johnson & Johnson, 2013 WL 1629191, at *8 (N.D. Cal. Apr. 16, 2013).  "[A] plaintiff's reliance on a lack of scientific evidence or inconclusive, rather than contradictory, evidence is not sufficient to state a claim."  Id.  However, "[a] claim can survive a lack of substantiation challenge by, for example, alleging studies showing that the defendant's statement is false."  Id.

In this case, some of Plaintiff's allegations are based on lack of substantiation.  For example, he alleges that "Defendant does not have any credible, competent scientific evidence that substantiates its representations regarding the sexual health and performance benefits of consuming Staminol," (FAC ¶ 4), and that "there is no real evidence" that oat straw stems, catuaba bark, muira root, damiana leaf, and saw palmetto berry improve sexual function in men, (id. ¶ 21).

Some of Plaintiff's cited articles also describe only a lack of substantiation, as they conclude that there is either a lack of evidence or that results are inconclusive.  The article on maca concludes that there is "limited evidence for the effectiveness of maca in improving sexual function," but that "the total number of trials, the total sample size, and the average methodological quality of the primary studies *were too limited to draw firm conclusions*."  See Shin, supra note 4, at 5–6

- 13 -

(emphasis added).  Similarly, the NYU Longone Medical Center's website concludes that "there is *as yet no real evidence*" that oat straw, catuaba, damiana, muira, and saw palmetto offer any benefits as to sexual function, and that "[t]he scientific evidence for the effectiveness of saw palmetto in treating prostate enlargement *is inconsistent*."  See supra notes 6 & 7 and related text (emphasis added).

However, Plaintiff also alleges at points that the studies actually refute GNC's representations about Staminol.  For example, he refers to the article on icariin, which found that its inhibitory potency was 80 times lower than that of Viagra, which, he claims, "clearly indicates" that the horny goat weed in Staminol "has no impact on the product's ability to achieve the health and sexual performance benefits that Defendant advertises."  (FAC ¶ 18.)  Similarly, he relies on the study on L-arginine, which found that L-arginine taken alone had no effect on improving erectile function, which, he claims, "clearly demonstrates" that L-arginine is incapable of producing the advertised benefits.  (Id. ¶ 20.)

In light of these last-referenced allegations, Plaintiff has alleged more than a lack of substantiation.  Accordingly, the motion to dismiss on this basis is denied.  The court notes, however, that this claim is viable only to the extent that it relies on evidence that refutes the Staminol representations, as opposed to a lack of evidence or inconclusive evidence.  The court returns to this issue below.

### ii.  Puffery

Next, GNC contends that the statement "[f]ormulated with premium ingredients to provide maximum potency" is non-actionable puffery.  (Doc. No. 25-1 at 13–14.)  GNC cites a number of cases discussing that superlative adjectives like "premium" and "maximum" are typical of puffery.  See, e.g., Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246 (9th Cir. 1990) ("best technology, lower rates, and better customer service," "far brighter than any lamp ever before offered for home movies"); In re Sony Grand Wega KDF-E A10/A20

1    Series Rear Projection HDTV Television Litig., 758 F. Supp. 2d 1077, 1089 (S.D.

2    Cal. 2010) ("high" or "superior" quality).

3        Plaintiff counters that statements must always be addressed in context and

4    that this statement is not puffery in context because "it makes the factually specific,

5    objective claim that the ingredients found in Defendant's Product are actually

6    effective." (Doc. No. 26 at 8.)  Plaintiff further argues that even if the statement

7    is puffery in isolation, it should not be dismissed because it contributes to the

8    deceptive nature of the product's packaging as a whole. (Id. at 9.)

9        Representations that amount to puffery are not actionable under California's

10   consumer-protection laws. See Peviani v. Natural Balance, Inc., 774 F. Supp. 2d

11   1066, 1072 (S.D. Cal. 2011).  Puffery is "exaggerated advertising, blustering, and

12   boasting upon which no reasonable consumer would rely." Southland Sod Farms

13   v. Stover Seed Co., 108 F.3d 1134, 1145 (9th Cir. 1997) (internal quotation marks

14   omitted).  "While product superiority claims that are vague or highly subjective

15   often amount to nonactionable puffery, misdescriptions of specific or absolute

16   characteristics of a product are actionable." Id. (citation and internal quotation

17   marks omitted).  Thus, a factual representation that makes "a specific and

18   measurable claim, capable of being proved false or being reasonably interpreted

19   as a statement of objective fact" is not puffery. Coastal Abstract Serv., Inc. v. First

20   Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir. 1998).

21       Whether an alleged misrepresentation constitutes puffery is a question of

22   law appropriate for resolution on a Rule 12(b)(6) motion to dismiss. See Newcal

23   Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1053 (9th Cir. 2008).  However,

24   it is the "rare situation" that granting a motion to dismiss a claim under the UCL

25   is appropriate on this basis. Williams, 552 F.3d at 939.

26       It is true that the words "premium" and "maximum," viewed in isolation,

27   are the kind of subjective terms that are typical of puffery, as GNC's authorities

28   demonstrate.  However, in context with the other representations on the Staminol

label, the statement "[f]ormulated with premium ingredients to provide maximum potency" arguably promises consumers that the product is capable of producing some effect on male potency (as opposed to maximum potency of the product).  If Plaintiff can prove that Staminol is totally incapable of doing so, this statement is provably false to the extent that it makes that representation, or at least contributes to the likelihood that the packaging is deceptive as a whole.  Accordingly, the motion to dismiss the UCL claim based on a fraud theory is denied to the extent GNC argues that it is barred by the "puffery" defense.

### iii.   Non-Disclosure

GNC contends that Plaintiff cannot assert a non-disclosure claim because he has not alleged facts showing that GNC had an affirmative duty to disclose. (Doc. No. 25-1 at 16–17.)  GNC points out that, under California law, a duty to disclose can arise in four circumstances:  "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but suppresses some material fact."  Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1142 (9th Cir. 2012).  According to GNC, none of these circumstances are present here.

Plaintiff counters that he has sufficiently alleged a duty to disclose under the third and fourth factors of the test above, and, in that respect, his claim is just like the one in Vasic v. Patient Health LLC, 2014 WL 940323 (S.D. Cal. Mar. 10, 2014).  (Doc. No. 26 at 11–12.)  In Vasic, the plaintiff stated a viable non-disclosure claim by alleging that the defendants "made representations through their uniform advertisements and packaging that stated that the Products provided joint-health benefits while suppressing the material fact that the product[s] do no such thing." 2014 WL 940323, at *5 (internal quotation marks omitted).

GNC replies that Plaintiff's approach would convert every misrepresentation

15cv0079

1  into a non-disclosure claim, regardless of whether a duty to disclose exists.[8]  (Doc.

2  No. 27 at 8.)

3      California courts have considered this very issue in the context of a CLRA

4  claim, reasoning that "[i]t is fundamental that every affirmative misrepresentation

5  of fact works a concealment of true fact."  Outboard Marine Corp. v. Superior

6  Court, 52 Cal. App. 3d 30, 36 (1975).  In Outboard Marine, the plaintiff's first

7  cause of action was for fraudulent concealment, and his second cause of action was

8  for fraudulent misrepresentation.  See id. at 34.  The court concluded that they were

9  a single cause of action because "[a]n active concealment has the same force and

10  effect as a representation which is positive in form."  Id. at 37.

11      In light of Outboard Marine, the rule is not as limited as GNC would have

12  the court believe.  Two of the main cases GNC cites for this discussion state that

13  an omission is actionable if it is either (1) "contrary to a representation made by

14  the defendant," or (2) "an omission of fact the defendant was obligated to disclose."

15  Wilson, 668 F.3d at 1141 (internal quotation marks omitted); Daugherty v. Am.

16  Honda Motor Co., 144 Cal. App. 4th 824 (2006).  In the latent-product-defect cases

17  GNC relies upon, only the duty-creation rules were at issue because no contrary

18  affirmative misrepresentation was alleged.  See, e.g., Daugherty, 144 Cal. App.

19  at 835 ("In Daugherty's case, no representation is alleged relating to the F22 engine,

20  which functioned as warranted."); Falk v. General Motors Corp., 496 F. Supp. 2d

21  1088, 1095 (N.D. Cal. 2007) ("[P]laintiffs do not allege any representations by GM

22  about their speedometers.").

23      Here, regardless of whether non-disclosure is viewed as the logical converse

24  of affirmative misrepresentation (as in Outboard Marine), or as a function of the

25

26      [8]  GNC also argues that "the Ninth Circuit has confirmed that a non-
27  disclosure claim must relate to a safety related issue."  (Doc. No. 27 at 8.)  However,
   GNC first raised this argument in its reply brief.  Accordingly, the court does not
28  address it.  See Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003)
   ("[W]e decline to consider new arguments raised for the first time in a reply brief.").

1  duty-creation rules (as in <u>Vasic</u>), the conclusion is the same:  Plaintiff has alleged
2  a non-disclosure claim, but only to the extent that he has alleged an affirmative
3  misrepresentation.

### iv.   Particularity

5      Next, GNC contends that Plaintiff's allegations do not satisfy the heightened
6  pleading requirements for fraud under Federal Rule of Civil Procedure 9(b) because
7  the reports he relies on do not demonstrate that the statements on the Staminol label
8  are false.  (Doc. No. 25-1 at 12.)

9      Plaintiff responds that he has sufficiently pleaded a claim under Rule 9(b)
10 by alleging and citing scientific evidence to show that the main ingredients in
11 Staminol do not provide any of the health and sexual performance benefits GNC
12 claims.  (Doc. No. 26 at 6–7.)

13     Rule 9(b)'s heightened pleading standards apply to consumer-fraud claims
14 under the UCL.  <u>See</u>  <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1125 (9th Cir.
15 2009).  "Rule 9(b) demands that the circumstances constituting the alleged fraud
16 be specific enough to give defendants notice of the particular misconduct so that
17 they can defend against the charge and not just deny that they have done anything
18 wrong."  <u>Id.</u> at 1124 (ellipsis and internal quotation marks omitted).  To meet this
19 standard, the complaint "must identify the who, what, when, where, and how of the
20 misconduct charged, as well as what is false or misleading about the purportedly
21 fraudulent statement, and why it is false."  <u>Salameh v. Tarsadia Hotel</u>, 726 F.3d
22 1124, 1133 (9th Cir. 2013).

23     Here, the court finds that Plaintiff's allegations are sufficiently particular
24 to give GNC notice of the specific basis of the claim and to allow it to defend
25 itself.  Plaintiff has identified the representations that are alleged to be false and
26 specifically why he claims they are false, i.e., because, according to him, the reports
27 show that Staminol's main ingredients are incapable of providing the promised
28 benefits.  Whether these allegations make it plausible that the representations are

false is a separate issue.  Accordingly, the motion to dismiss for lack of particularity is denied, and the court turns to the issue of plausibility.

### vi.    Plausibility

On this point, GNC contends that Plaintiff's "fraudulent" UCL claim is not plausible because the reports he relies on did not study the specific formula in Staminol and did not address the claims actually made on the Staminol label.  (Doc. No. 25-1 at 5–8.)  GNC points out that Staminol represents only that it "supports" male vitality, sexual health, and urinary flow, not that it will treat or cure erectile dysfunction, benign prostatic hyperplasia, or any other disease, and that the label expressly states, "This product is not intended to diagnose, treat, cure, or prevent any disease." (Id. at 8.)  GNC cites three cases that dismissed similar consumer-protection claims for similar reasons.

In Eckler v. Wal-Mart Stores, Inc., 2012 WL 5382218 (S.D. Cal. Nov. 1, 2012), the plaintiff claimed that Wal-Mart's representations regarding the joint-care benefits of its product Equate Glucosamine MSM Advanced Triple Strength were false because the representations had been disproved in various scientific studies. See id. at *3.  The claim was dismissed because the studies addressed only some components of the formulations; there was a mismatch between the studies, which focused on osteoarthritis, and the general joint-health and comfort claims on the label; and the packaging plainly stated that the product was "not intended to diagnose, treat, cure, or prevent any disease." Id. at *6.

Similarly, Padilla v. Costco Wholesale Corp., 2013 WL 195769 (N.D. Ill. Jan. 16, 2013), dismissed a claim that Costco's representations regarding its joint-health dietary supplement, Kirkland Signature Extra Strength Glucosamine HCL, were false. See id. at *3.  The court reasoned that "none of the clinical studies Padilla cites assess the effectiveness of glucosamine and MSM"; the studies focused only on the effectiveness of glucosamine and chondroitin in treating osteoarthritis; and the label did not claim that the product was effective for treating

1  osteoarthritis.  Id.

2       Similarly, Toback v. GNC Holdings, Inc., 2013 WL 5206103 (S.D. Fla.

3  Sept. 13, 2013), dismissed a claim that GNC's representations about its joint-care

4  supplement TriFlex Vitapak were false because the product was ineffective for

5  its advertised purpose.  See id. at *6.  The court cited Eckler and reasoned that

6  the plaintiff had challenged the effectiveness of only two of the ingredients, but not

7  the "efficacy of the TriFlex Vitapak's multifarious composition in promoting joint

8  health."  Id. at *5.

9       Plaintiff counters that these cases did not apply the correct standards for

10  ruling on a motion to dismiss, which require only plausible allegations, not proof.

11  (Doc. No. 26 at 5–7.)  According to him, "When studies show that **none** of a

12  product's **core** ingredients produce the advertised results, a plaintiff has stated a

13  plausible claim that the product as a whole does not."  (Id. at 6.)

14       Several of the cases Plaintiff relies on for this point support this court's

15  lack-of-substantiation and Rule 9(b) analyses above, but are not helpful on the

16  present issue because they did not discuss factual plausibility.  See Hesano v. Iovate

17  Health Sciences, Inc., 2014 WL 197719, at *3 (S.D. Cal. Jan. 15, 2014) (holding

18  that claims were not impermissible lack-of-substantiation claims); In re Clorox

19  Consumer Litig., 894 F. Supp. 2d 1224, 1232 (N.D. Cal. 2012) (same); Cardenas

20  v. NBTY, Inc., 870 F. Supp. 2d 984, 995 (E.D. Cal. 2012) (holding that allegations

21  were sufficiently specific to satisfy Rule 9(b)).

22       A fourth case, Rosales v. FitFlop USA, LLC, 882 F. Supp. 2d 1168 (S.D.

23  Cal. 2012), held that studies showing that other brands of purported "toning and

24  fitness" shoes were ineffective were enough to make it plausible that FitFlop

25  footwear was similarly incapable of producing health benefits.  See id. at 1176.

26  FitFlop is not particularly helpful here, however, because it addressed footwear

27  rather than supplement formulations, which present a conceptually different

28  problem.

1   However, two recent cases Plaintiff cites did involve supplement

2   formulations, and both denied motions to dismiss.  Dorfman v. Nutramax

3   Laboratories, Inc., 2013 WL 5353043 (S.D. Cal. Sept. 23, 2013), challenged the

4   advertising for Cosamin joint-care products, which claimed that Cosamin would

5   "reduce joint pain" and "protect cartilage cells from breaking down."  Id. at *3.  The

6   plaintiff cited twenty-two studies that allegedly showed that "neither glucosamine,

7   chondroitin, nor any other supplements or ingredients actually regenerate cartilage

8   or provide joint comfort or relief from pain."  Id. at *11.  These allegations made it

9   plausible that a reasonable consumer would be deceived.  See id.

10  Similarly, Vasic v. Patient Health LLC, 2014 WL 940323 (S.D. Cal. Mar. 10,

11  2014), addressed the advertising for Trigosamine joint-care products, which claimed

12  that the formulas would relieve joint pain and lubricate and build cartilage.  See id.

13  at *1–2.  The plaintiff alleged that studies had "universally" shown that the primary

14  ingredients, glucosamine and chondroitin sulfate, had "absolutely no scientific value

15  in the treatment of joint pain or discomfort."  Id. at *1.  The defendant presented

16  arguments similar to those GNC advances here:

17
18          Defendants argue Plaintiff's claims must be dismissed because
            the scientific evidence included in the FAC only evaluated the
19          effectiveness of glucosamine and chondroitin (alone or in
            combination), did not test the actual Products at issue, and only
20          assessed whether the prescribed dosage utilized in the studies
            successfully treated osteoarthritis and not the representations at issue.
21          Therefore, Defendants contend that because there are several active
            ingredients in the Products, and the Products include an express
22          disclaimer that they are not intended to "diagnose, treat, cure, or
            prevent any disease," none of Plaintiff's studies support their
23          allegations.

24  Id. at *4.  The court disagreed:

25          Plaintiff is not alleging that Defendants' representations are based
            on clinical studies regarding the Products at issue or alleging that the
26          Products do not treat osteoarthritis.  Instead, the FAC cites to selected
            studies that looked at the effect of certain substances, which Plaintiff
27          alleges are the primary ingredients of the Products, in an attempt to
            provide support for Plaintiff's allegations that those substances do not
28          "relieve joint discomfort," "lubricate the joints," and/or "build and

1  maintain healthy, protective cartilage and joints,"—all of which
2  Plaintiff alleges are symptoms of osteoarthritis.  Therefore, the Court
   finds that because the studies cited by Plaintiff looked at products that
3  share some of the same active ingredients as the Products at issue,
   Plaintiff's claims are facially plausible.

4  Id.

5      None of these cases are binding on this court, but they do provide guidance

6  that is both persuasive and helpful here.

7      First, the effect of the disclaimer ordinarily cannot be determined on the

8  pleadings.  See Dorfman, 2013 WL 5353043, at *11 ("The presence of a disclaimer

9  on the Cosamin products does not require dismissal of the fraudulent advertising

10 claims at this stage of the proceedings."); Johns v. Bayer Corp., 2010 WL 2573493,

11 at *4 (S.D. Cal. June 24, 2010) ("While there are disclaimers and qualifying

12 language, determining whether a reasonable consumer would be deceived is

13 inappropriate at this stage of the litigation.").  This is because the Ninth Circuit has

14 held that "whether a business practice is deceptive will usually be a question of fact

15 not appropriate for decision on demurrer."  Williams, 552 F.3d at 938.

16     Second, the starting point must always be the representations at issue,

17 but there is some blurriness about what a reasonable consumer would see in them.

18 Here, the product is called "Staminol," it contains ingredients with names like

19 "horny goat weed," and it purports, among other things, to "enhance male sexual

20 performance" and "provide maximum potency."  (Doc. No. 25-3, Exh. 1.)

21     Third, the court is not persuaded, as GNC urges, that Plaintiff must present

22 a study testing Staminol or its specific combination of ingredients, at least at this

23 stage.  The ordinary plaintiff will not have the resources to do so, and such a rule

24 would allow manufacturers to immunize themselves from liability by including a

25 variety of obscure or unstudied substances in their formulations.  Hence, studies of

26 similar products (as in FitFlop), and studies showing that no supplement can deliver

27 the promised benefits (as in Dorfman) or that the main ingredients cannot do so

28 (as in Vasic), may often be enough at the pleading stage.

Last, and, most importantly, the essential inquiry depends upon a comparison of the match "between the representations at issue and the evidence that allegedly debunks them." Eckler, 2012 WL 5382218, at *7. At this point, it is necessary to remember that allegations that representations are merely unsubstantiated do not tip the scales.

This is where the present allegations run aground. As discussed earlier, the maca article and the NYU Langone Medical Center's website indicate only a lack of substantiation for some of the representations, not that they are provably false. Two articles remain, one concluding that the icariin in one variety of horny goat weed has 80 times less PGE5 inhibitory potential than Viagra, and the other concluding that L-arginine is not effective in treating erectile dysfunction when taken alone. Other difficulties aside, the main problem is that these articles only address erectile function. They do not facially or logically suggest that these substances have no effect on other aspects of male sexual performance or vitality.[9] In other words, there is a mismatch between the representations and the studies, as there was in Eckler. And, even if that were not so, there are still ten or eleven other ingredients that may support the advertised benefits of Staminol.

One additional comment seems in order. GNC complains at several points that Plaintiff has not alleged facts about his own use of Staminol and "whether he noticed any changes in his body after taking the product." (Doc. No. 25-1 at 12.) Ordinarily, there might not be a need for such allegations, at least for this analysis, because "it's really only scientific testing that can show a supplement's claims to be truly false and/or misleading." Eckler, 2012 WL 5382218, at *3 n.2. However, because, as noted above, Plaintiff has placed in issue (as support for fraud) his own use of Staminol, without the promised performance benefits being delivered, more

---

[9] At this juncture, it is important to note that Plaintiff's allegations regarding the specific performance purpose for which he purchased and consumed Staminol are unclear. Was it for erectile dysfunction or some other reason? Plaintiff must specify his purpose in any future amendment.

1   specificity on this subject is required.

2       For the reasons stated, Plaintiff's UCL fraud claim is dismissed with leave to

3   amend.

4       **B.   "Unlawful"**

5       As to his claim under the "unlawful" prong, Plaintiff alleges that GNC

6   violated California Civil Code §§ 1572 (actual fraud), 1573 (constructive fraud),

7   1709 (fraudulent deceit), 1711 (deceit upon the public), 1770 (the CLRA), as well

8   as California Business & Professions Code §§ 17200 et seq. (the UCL), 17500 et

9   seq. (the False Advertising Law), and the common law.  (SAC ¶ 38.)

10      GNC contends that this claim must be dismissed because Plaintiff only

11  conclusorily alleges that GNC violated these laws, without pleading the elements

12  of the claims.  (Doc. No. 25-1 at 18.)

13      Plaintiff's only response is that he "alleges separate causes of action under

14  the CLRA and California State law and the detailed facts to support the unlawful

15  prong violations" in paragraphs 49 through 66 of the FAC.  (Doc. No. 26 at 13.)

16      Paragraphs 49 through 66, however, contain only Plaintiff's second and third

17  claims, for violation of the CLRA and breach of express warranty.  As discussed

18  elsewhere in this order, those claims are not plausible as pleaded, so, at this point,

19  they cannot support an "unlawful" prong claim.  Plaintiff did not attempt to

20  defend the other predicate illegalities, which, the court notes, all appear to require

21  additional elements not alleged in the FAC, such as intent.  This claim is also

22  dismissed with leave to amend.

23      **C.   "Unfair"**

24      Plaintiff alleges that GNC "engaged in false advertising, misrepresented

25  and omitted material facts regarding Staminol, and thereby offended an established

26  public policy, and engaged in immoral, unethical, oppressive, and unscrupulous

27  activities that are substantially injurious to consumers."  (SAC ¶ 40.)

28      GNC contends that the claim must be dismissed because Plaintiff has merely

1  recited the bare elements of an unfair-prong claim.  (Doc. No. 25-1 at 17.)

2  Plaintiff responds that GNC's practice of advertising that Staminol has

3  benefits it does not have is an "unfair" practice, as several courts have concluded.

4  (Doc. No. 26 at 13–14.)  However, as discussed already, Plaintiff's present

5  allegations do not make it plausible that GNC is advertising benefits Staminol does

6  not possess.  This claim is, therefore, also dismissed with leave to amend.

7  **2.     CLRA Claim**

8  Plaintiff alleges that GNC violated the CLRA by making materially false

9  or misleading statements and omissions on the Staminol packaging, in violation

10  of California Civil Code § 1770(a)(5), (7), (9), and (16).[10]  (FAC ¶¶ 49–57.)

11  There is no need to address this claim separately because the reasonable

12  consumer standard that applies to "fraudulent" UCL claims "applies equally to

13  misrepresentation-based claims under the CLRA."  O'Shea v. Epson Am., Inc.,

14  2011 WL 3299936, at *4 (C.D. Cal. July 29, 2011) ("[C]ourts often address these

15  claims in tandem.") (citing cases); see also Williams, 552 F.3d at 938 ("[C]laims

16  under these statutes are governed by the 'reasonable consumer' test."); Eckler,

17  2012 WL 5382218, at *7 ("There is no need to separately address Eckler's CLRA

18  claim.").  The parties have also addressed both claims at once.  Hence, GNC's

19

20  [10]  These provisions prohibit the following acts:

21
22  (5)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . . .

23
24  (7)  Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

25
26  (9)  Advertising goods or services with intent not to sell them as advertised.

27  (16)  Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

28  Cal. Civ. Code § 1770(a).

1  motion to dismiss this claim is granted, with leave to amend, for the same reasons

2  Plaintiff's claim for violation of the "fraudulent" prong of the UCL was dismissed

3  and may be amended.

4  **3.    Breach of Express Warranty**

5      Plaintiff alleges that the representations on the Staminol packaging created

6  an express warranty that the product would provide the promised benefits, and that

7  GNC breached the express warranty by providing a product that did not provide the

8  promised benefits.  (FAC ¶¶ 58–66.)

9      "Under California law, any affirmation of fact or promise relating to the

10  subject matter of a contract for the sale of goods, which is made part of the parties'

11  bargain, creates an express warranty."  McDonnell Douglas Corp. v. Thiokol Corp.,

12  124 F.3d 1173, 1176 (9th Cir. 1997) (summarizing Cal. Com. Code § 2313(1)(a)).

13  "In order to plead a cause of action for breach of express warranty, one must allege

14  the exact terms of the warranty, plaintiff's reasonable reliance thereon, and a breach

15  of that warranty which proximately cause[d] plaintiff injury."  Williams v. Beechnut

16  Nutrition Corp., 185 Cal. App. 3d 135, 142 (1986).  The plaintiff must also plead

17  that he provided the defendant notice of the breach within a reasonable time, which

18  the Ninth Circuit has construed to require pre-suit notice.  See Alvarez v. Chevron

19  Corp., 656 F.3d 925, 932 (9th Cir. 2011).  "The purpose of giving notice of breach

20  is to allow the breaching party to cure the breach and thereby avoid the necessity

21  of litigating the matter in court."  Id.

22      Here, the parties agree that this claim must be dismissed because Plaintiff

23  did not allege that he ever gave GNC pre-suit notice of the breach.  (Doc. No. 25-1

24  at 18–19; Doc. No. 26 at 14.)  GNC asserts that dismissal should be without leave

25  to amend because Plaintiff never provided notice.[11]  That fact is not properly before

26  the court, however, so this claim, like the others, is dismissed with leave to amend.

27

28      [11]  The court construes GNC's request for dismissal with prejudice as a
request for dismissal without leave to amend.

15cv0079

**CONCLUSION**

GNC's motion to dismiss, (Doc. No. 25), is GRANTED.  However, Plaintiff's request for leave to amend is also GRANTED.  Any amended pleading must be filed within 14 days after entry of this order.

IT IS SO ORDERED.

DATED:  May 13, 2015

_____
Hon. Jeffrey T. Miller
United States District Judge

15cv0079